I would think that the state will go first because the state is the petition. I misidentified the people, not the parties. May it please the court. Before you start, let me ask you a question. Of course. Can you tell me what the significance would be between a finding of 9 loci and a finding of 10 loci? It would just be different data. If the state had a piece of evidence and DNA analysis was done on that particular piece of evidence and 9 loci were identified, then we would have a 9 loci profile. We would know the identity of the DNA profile at those 9 locations. And then as far as the statistical portion went, a frequency could then be calculated based on those 9 calculations. If that same piece of evidence instead generated information regarding the DNA profile at 10 locations, we would just have that information.  And what would that information have to do with proving identification? Well, a profile that's identified on a piece of evidence, whether it be 1 locus or 13 loci, gives... Wait, let me stop you there. You're telling me that you can identify a person as the perpetrator from 9 loci? I'm saying that when we have a piece of evidence and we're able to establish a DNA profile at 9 loci, that's the data that we have. That's the fact that we have. Does that prove identification? Well, I guess I'm not understanding what you mean by identification. If we have a profile at 9 loci and a piece of evidence, and then we also have a profile of a person who at those same 9 locations, the same 9 loci, has the same alleles, then we can say there is a match at those 9 alleles. We can then also generate a... And there are 13 in a 1450 that is an identifier of gender. Generally speaking, yes. There are 13 markers used in a CRM. Perhaps let me elaborate a little bit on Justice Gordon's question. Could you establish a, quote, match with 9 loci? Or the best you could do is to establish a non-exclusion.  Is there a difference between a non-exclusion and the match? I've got a few questions wrapped up here, but I'd like to hear some elaboration. The short answer is you don't need 13 for a match. In fact, you only need one for a match. Why then is the finding here a non-exclusion rather than an outright statement that there is a match? What's the significance of that? Well, if you're talking about a non-exclusion, you're talking about the evidence identified on the underwear, not the rectal swab. Now, the evidence identified in the underwear has absolutely nothing to do with the defendant's argument regarding the database search. His argument that he should have had a database search or that only relates to the statistics for the rectal swab. Are you sure that that's all he's arguing? I mean, I got the impression that he is contending that this study, the Arizona study, and then if there had been one from Illinois, but there was subsequent, that he would use that to cross-examine on both of the standards. No, it's my understanding that it would only have to do with the rectal swab. All right. Well, we'll let him speak. We'll let him answer that question. Let me ask you this. Okay. Scrolling this out, as the DNA evidence has evolved, at one time there were perhaps five points that were used to say that not that something is a match, but that based on these probabilities that the likelihood of this matching, in other words, the known DNA profile, when compared to the sample of evidence, is that the probability of that occurring in a universe is so matched, whatever. As opposed to saying this is a match. That's not how the testimony is normally presented. No, and I guess maybe the best way to explain this is to break this down. There are two aspects to DNA evidence. There's the biological aspect, and then there's the statistical portion of the analysis. When you're referring to the match, that relates to the biological portion of the analysis. So the actual evidence is worked up using the PCR and the FTR methodology. A profile is generated. The number of locations that we're able to get a profile on differs on every piece of evidence. So that profile is generated. So that's still in the biological aspect of the analysis. Then if there is someone, a person or a piece of evidence from another case, where an association is made, meaning there is a, I guess you'd say, match at the number of loci identified in the evidence. Well, would there be a match if there was a total identical similarity between two loci or between four loci or between six loci? At what point would you think that the terminology of match would become appropriate forensically? Forensically, it's appropriate at one locus. I guess maybe where some of the... Well, do you have a statistical probability with one loci to claim a match? Again, the match, the idea of match comes before the statistics. And the biological aspect of DNA evidence on a piece of evidence doesn't actually identify a particular offender. All it says is, this profile is present on this rectal slug. And then when we have a known person, we can look at that person's profile and say, this person's profile is consistent with being a contributor to this piece of evidence. So I guess when the term identify is used, it's not like the biological aspect of the lab work says specifically, this is the guy who contributed it. What it says is, this guy's profile matches, or in the case of underwear, cannot be excluded from being a contributor. Well, does it share with it the significance of the statistical probability or improbability of having others also, for whom the term match would be appropriate based on these comparisons? It has a statistical probability and a statistical significance. The numbers would be different. What is that? Do we know? Yes, because, for example, with a one locus profile, you would use the same mathematical approach to calculate the frequency of that profile. What's the chance that if I took the general population at whole and plucked somebody out at random, what's the chance that they would match these specific alleles? So if, let's say, at that locus there was a 15 and a 16, what's the chance, how many people in the general population would be expected to have a 15 and a 16 at this location? That's the question that the statistics, the random match probability, asks. And that is, that's the, granted you take the two of them together, because when you take the actual biological evidence coupled with the significance of the rarity of that evidence, then from that you glean identity. Well, have the probabilities been the subject of any kind of meaningful study so that, forensically, we're not calling something a match when nine out of ten, 90 percent of the population could also maintain that same identity? What kind of probability do we look for? The probabilities are generated by using frequencies, allele frequencies, generated by the FBI, which were gleaned from population studies. Now that gets us into product and database, doesn't it? The difference between product studies and database studies, doesn't it? Well, that's a population study versus a database study. If by database study you mean an all-pairs trawl looking for any nine or more low-side matches, yes, that is completely different, but they answer two completely different questions. So the data, the allele frequencies calculated by the FBI, are then used to calculate the overall profile, the overall rarity of a particular profile on a particular piece of evidence. And those have been subject to scientific testing. Have any threshold statistical studies been formulated? At what point evidence of DNA similarities, what kind of probabilities you will need before it becomes admissible as being more relevant than it is heat producing? Well, no, because the issue of relevance is one that would be addressed by our trial courts, not by mathematicians and scientists.  And then it's up to trial courts to decide whether or not those are relevant to come in in courts of law in criminal prosecution. And in this case, what this case actually boils down to, despite all of its complexities and its procedural posture, is a question of relevance. The state's evidence regarding the rectal swab had two components, as I've said. The biological, the match. Can I interrupt you here again, please? I didn't find objections to the relevance of the admissibility of the nine MOSI studies. What seems to be in question is whether whatever relevance it has, whether it's of such an absolute nature as to preclude alternative studies derived from alternative approaches, which seems to me breaks down at least into two questions. One, is the alternative study phi eligible? And two, is an alternative study relevant to the extent that the probabilities are not already preempted by the nine MOSI study? I disagree. I respectfully disagree. I think that the only question and the primary question is relevance. And it has been objected to and, in fact, it's never been established. If this court looks back and looks through defendants' arguments on appeal and on rehearing, as well as at the trial court level, it will find that relevance was never actually established. It was conclusively stated initially. The defendant originally made a motion to exclude the rectal swab based on a claim discovery issue. In the alternative, he just kind of threw out there a statement. Oh, in the alternative, we want a study of the Illinois offender database like this one done in Arizona. And that's the initial, that's the extent of his initial statement. But that is in the written document or was that ever stated on the record? That was in the initial written document. It was never argued at the motion. Correct. Then the state. Well, in this case, one of the issues here is forfeiture. Correct. The state argued initially that this has been forfeited. Correct. And it argues that the claimed error does not fit into either one of the prongs of the plain error doctrine. One, the evidence is not closely balanced. Two, that this is not an error of a substantial right so that the trial is unfair. And in the opinion that we issued, we said it did fit into the plain error doctrine. With all due respect, I thought that the thrust at least of the state was to disprove the second prong, which is whether it fits the glass bar standard of structure. But how are you going to attack the closeness issue when this whole case rests on DNA identification? Well, because first, our primary argument is not to attack the plain error analysis. That is certainly part of it. I just wanted to go back to you with this. And I wanted to clarify what your position is on the record. And that is, at the time that this motion was filed, it was a motion to bar evidence of the record swap. Correct. And at that hearing on that motion, both parties presented their arguments. Correct. And the court denied the motion to bar. And it basically said that I think your argument goes to the weight of this evidence, not to its admissibility. Is that kind of what you recall? Yes, but the court, as far as that statement goes, the court was talking about the discovery argument, not the database search argument, because that was never actually brought out. I get what I'm saying, that the court denied the motion to bar evidence of the record swap and said that based on what you've argued, that I believe your objection is to weight, not to admissibility. And at that hearing, I don't believe there was any further mention about a request for either allowing the Arizona study or making a formal request for an Illinois database comparison. That is correct, to the best of my recollection. And I'll actually do you one better. The defendant then filed a motion to reconsider the trial court's ruling regarding the exclusion of the record swaps, and he doesn't mention the database search issue anywhere in there. The tension here is that this comes in under the plain error exception. I think he's conceding that it wasn't raised in the various motions. But I would submit that this court is unable, based on the proceedings below and this record and the fact that relevance was never actually stated. All that was stated was in defendant's reply to the pretrial motion, this is relevant, is what it said. There's no discussion of why. He attached the results of the Arizona search and then said, this is relevant to the statistics, and never fleshed out why. Based on that, there's no way for this court to actually meaningfully assess whether error occurred in the first instance. So before the court even were to get to closely balanced versus... Well, I think one of the problems, as I see it in this case, from one perspective, is whether this becomes an issue of ineffective assistance of counsel as opposed to plain error, and that's not conceding necessarily that the ineffective assistance of counsel satisfies the second prong of Strickland. But at what point is the court called upon to act sui sponte, and at what point is the court not responsible for initiatives other than simply rulings? When you say the court, are you speaking of this court or the trial court? The trial court, of course. That's what we're doing. I think when it comes to issues of relevance and requests regarding evidence, requests for particular orders regarding evidence, that the onus is decidedly on the proponent of the evidence to make the record. And I think that it does everyone, both the parties in the trial court below and now the parties up before this court, a real disservice to expect or to suggest that a defense attorney either could just kind of toss something out there. There's this Arizona study. The point that I was trying to make, and I think lingers here, is if, in fact, the defendant would not have made any motion at all involving seeking the discovery on either the Illinois study or seeking the admissibility of the Arizona study, I don't see how plain error, even if it was, we can see that the evidence is closely balanced, would require a circuit judge to himself, sui sponte, decide that this calls for a 165 motion, because that's probably a circuit of judicial intervention. Correct. Rather than something that should be subject to plain error. Correct. But if a motion is made or something routinely happens during the court's procedure where error is perpetrated for the court to pick up the error, and the court can't pick up an error by simply saying that the attorney's defendant's tactic is the wrong one, because there is a whole universe of tactics, strategies, motions they could be making. So that poses a bit of a problem for me, obviously. That's a softball to you, but I'd like to hear some comments from your opponent. I think one of the basic problems that we have in the whole picture is the question that the courts really are the gatekeeper to make sure that defendants receive a fair trial. And when DNA is so misunderstood by many and understood by so few, and what happens is that when experts testify as to the word match, the jury, who may not know the difference between the word prior and subsequent, believe that the word match is he did it. And that's a problem. And that must be addressed. And it was addressed in this case on cross-examination. I'm thinking about your brief on page 16. I'm sorry, which brief? On page 16 of your brief. The blue brief? The blue brief. The original brief in this case. On page 16 you say, defendant was not convicted because of the nine locus match, but because that match was more than corroborated by the 13 locus match that indicated that he and no one else could have been M.D.'s assailant. Now, what exactly do you mean by that? And what do you base that on in terms of this DNA evidence? I think what that statement says, and I was not on this original brief, so is that. Whatever it was. Okay. This is what it means. I'll tell you what it means. What it means is that I think it's addressing the misconception, which I think can easily be pulled from defendants' arguments on appeal, that this nine loci, that this rectal swab was the only evidence suggesting defendant's guilt in this case. So I think that's why the reference to the 13 loci analysis of the underwear comes in. I think it's to point out, listen, this piece of evidence, the rectal swab, was not all we had. We also had the underwear sample. I understand, but the A-17 shows that as far as the underwear sample of the profile goes, that there were perhaps seven specific alleles at matching points between his actual standard and then what was in the underwear. Okay. And then there are several that have inconclusive. Correct. So I'm just trying to get back to that. What was that statement? What was the testimony in terms of the Harvey Wright DNA profile versus the underwear? Yes, the underwear. And was there testimony in this record that the likelihood, was there any testimony in this record about the likelihood that not only, that would relate to both his profile, the fact of the nine alleles that were in his profile that, for lack of a better word, matched the nine that were found in the rectal swab. And then, again, to those same alleles in the other evidence. Okay. I think I see what you're saying. There's no statistic or random match probability generated regarding Harvey Wright's profile, his known DNA profile from his rectal swab. There's no number generated to say this is how rare Harvey Wright is. He's rare. And then with respect to the rectal swab and the underwear, there are separate statistics generated for each one based on the data available for each one, and then the allele frequencies and the calculation of the random match probability of each one, independent of the other. And then each evidence is presented as a piece of evidence. So all the testimony regarding the rectal swab is admitted with respect to the rectal swab, and then the RMP for the rectal swab is given. And the statistical numbers for the underwear were greater. They were greater. The statistical numbers. I mean, it was more rare. It was more rare. I thought the underwear were discredited because they involved three parts. No, that's incorrect. The underwear involved a mixture. There was a major male donor, a major female donor, and then one additional minor donor that the gender could not be determined on. But that evidence did not statistically show that conclusively this is the guy. Well, statistical evidence, I guess, again, will never actually do that. It gives the rarity of the profile. Or reasonable probabilities. I mean, there was probably a quadrillion people that could fit in this category. Well, what the statistic with respect to the underwear does. Would there be a quadrillion people who could fall in the category here? With heart. With heart. I mean, how many people would fall in this category? How many millions or trillions? Well, we know that the profile identified on the underwear had statistics, and I'll give them to you, that if this court took 5.4 quadrillion black individuals, one person from those 5.4 quadrillion could not be excluded as a donor to that profile. Everyone else but that one would be excluded by the presence of one or more alleles in their profiles. And then there's similar statistics with respect to the white population and the Hispanic population. So that's what we know, and that's what was submitted to the court. Explain to us, then, why this study, this Arizona study, is like comparing apples to oranges for this particular piece of evidence. Because it has absolutely nothing to do with the state's evidence on the rectal swabs. The study basically says that there are so many people in the population of the numbers that they had that would have the same nine alleles at any point. But these, the alleles, well, I mean, there's 13 alleles, and then the 14th for gender. But you've argued that this Arizona study, like the Illinois, or the, the Illinois would not have any significance in terms of trying to cross-examine the expert that testified regarding the random match probability. Correct. And defendant actually admits that on rehearing. Defendant on rehearing admits that the results of a database search do not undermine how, the manner in which the statistic, in this case, for the underwear was reached. He's not challenging the product rule. It doesn't undermine that number. The numbers that came out at trial through eggs or holes with respect to the rectal swabs are correct, and defendant admits that. Defendant also admits, he admits that the number is correct and that the method by which the number was obtained is correct. Well, if the study, if he can't challenge the number itself or the manner in which it was reached, it's by definition not relevant. It has no chance of making any issue more or less probable. What is it that would explain, forgetting now the right to raise it, the procedural impediments, how do you explain such a broad disparity between the general population study and the database studies that seem, at least anecdotally, but they have not, no one has shot them down because they're simply anecdotal, including the Illinois study, and there's something in Maryland, I think, also. Yes, there was in Maryland. How does one explain such gross disparities? Because in actuality, no disparity exists. Why is that? How is that reconcilable? Because the random, I'm not a mathematician, but the mathematicians have said that it's not, that it has nothing to do with the other, but I guess in simple terms. If they each would pass a FRITE test as being a valid statistical study, how can they both coexist in the same universe? Well, I guess maybe it's still math, but it's simpler math. Maybe a way to describe it would say that there are two formulas for calculating two different things. The Pythagorean theorem calculates the hypotenuse of a right triangle. h squared plus b squared equals c squared. Then there's another formula that's used to calculate the circumference of a circle. The circumference equals the diameter times pi. I guess I would throw back to you that those are two mathematical formulas that coexist, but have nothing to do with each other. Except here, we're studying the same triangle with two different theorems. We're not studying the same triangle. That's what I'm asking. Would you explain that? Because in this case, we have a targeted profile. We have a profile on this rectal slab. A targeted profile. That's all we're looking at is a targeted profile. In the searches of the databases, you're not looking at a targeted profile. What you're doing is conducting billions of internal comparisons between people at all different locations with all different number of possibilities. Are you denying the relevancy if there were no other procedural impediments, but the sole objection to their coming in would be relevant? Correct. Would you say then that relevancy, that simply on the basis of relevancy, they would be inadmissible? Yes, I would. So you're basically saying they have no propitious significance. And I still think that if I could have understood that without elaborate explanation, I would have become a doctor, not a lawyer. I am saying that they have no, yes, no propitious significance, no relevance. And I understand that based on the posture of this case and the record, that that is somewhat of a difficult concept for us all to grasp. And that's why, respectfully, that shouldn't occur before this court in the first instance. If relevance was to be flushed out, it should have been done below. And I'm not speaking to forfeiture. I'm just talking about the practicality of review. It should have been done below so that the trial court could have held some type of hearing or heard evidence the state could have been given an opportunity to call experts and to disprove the relevance if the Senate was even able to bring anyone forward that could say it's relevant in the first instance. I mean, is it important that there would have been or should have been an offer of proof at the point in the record when the defense counsel said he asked a question about the Arizona study, the objection was the court said, and then there was no other comments ever made. If he had any intention of going there, there should have been an offer of proof. But we know that he was really kind of just throwing it out there strategically to, I don't know, just kind of toss it out there for the jury would be the only way to say it. Because prior to trial, he affirmatively stated in the record, we're not going to go into this. Well, now, that's something that counsel, certainly opposing counsel, would disagree with you on. It appears from a review of the record that that was not about the Arizona study, that you were referencing the Illinois study, the Illinois database, that had been completed at that point by then. Because you said, not you, but the assistant state attorney said that these experts aren't aware of that and it was not referring to the Arizona study. I agree. And I think initially we gave the defense the benefit of the doubt on that referencing the Arizona study because the defendant has always argued that there was some motion in Lemonade that the state kept him from presenting the Arizona study through a motion in Lemonade. That's the only motion in Lemonade that appears in the record. So that's all we've got and that's what references the database studies. And frankly, it's a distinction without a difference. Because this type of search of Arizona's database is no more or less relevant than the same kind of search of Illinois' database. One of the things you point out was that this profile did not generate another single hit. Correct. In the Illinois database. That was true then. There were no nine loci that would have called upon or called into question this sample that eventually was profiled as hits. That's correct and that is the answer today. It's highly admissible to attack the strength of the statistical proof offered in the general population by introducing alternative studies that countermand the statistical significance of a nine loci study. Namely, there may be a nine loci study in the context of general population proves X, but in the context of a database study proves Y. And isn't that all the plaintiff has to do? Because he has to inject evidence that could reasonably lead to reasonable doubt. But that's not true because that assumes the relevance in the first instance. Isn't there a problem with all those databases in that none of them, I'm talking about the Maryland, the Illinois, and the Arizona, don't take into account that individuals in that group could be related? That's part of it, yes. What are some of the other things that militate against comparing this database study to the testimony in this case? Well, the reason for not comparing them is because they ask two different mathematical questions. The reason that offender databases are not a good place to conduct, shall we say, reviews or studies of the frequency of alleles in a population. So actually that's really more comparing like the FBI's use of population studies to doing a similar study in a database instead. And your question regarding related individuals kind of comes into play there. When the FBI did its population studies, it was very careful to maintain, you know, no relatives to take a sampling base. This would be another one in Arizona study. It doesn't take into account at any point that some of these individuals that have the same nine alleles are related, not related. Are of different races, are of specific races. I mean, with the population studies done by, you know, in the FBI, it's broken down basically. There would have to be enough deviations of that nature to be able to reconcile one in 540 billion to suddenly emerging as one in 700. It would take a lot of relatives in the study, wouldn't it? No, because again, because the question, the all pairs fall of the database is not the same thing as the rarity of a particular profile. So while it sounds like there's some type of significance to it, there's just not. And I submit that if this court thinks about it, this original Arizona study search was first done in approximately, I think it was 2001, and was presented at a conference in 2001 or 2002. So that's roughly nine or ten years ago. If what the defendant is saying is true, if that study, if these types of searches of the database call into question the calculation of profile frequencies for evidence in criminal cases, the way we present DNA evidence in criminal courts across this country and the way statistics are generated would have been completely altered in the last ten years. And it hasn't been. And the reason why is because while these initial findings were discovered, they were then examined and addressed and completely discounted by the experts who already know this. So you're denying the statistical validity of the database studies. I'm denying the statistics. Which means that they would be subject to either the Daubert test or the Frye test, whatever it would take to establish the legitimacy of these statistical studies through a database. No one has really attacked these writings other than backhandedly at best in your written submissions. The secret to the whole thing is that if this DNA database search would be given to a defendant, then they could give it to an expert and the expert could testify against your expert, you see. And that's what it's all about. But this is not a situation where reasonable or where experts disagree and reasonable minds can differ. This was not a request for this in order for an expert to review. That was never the case. And he had the data. He could have given the Arizona study to an expert. There was certainly enough on the record that between two different assistant public defenders, if they had requested or wanted to call a DNA expert, there was never, ever any conclusion of that. There was never a denial of a request for that. There was never a suggestion in discovery that the defendant wanted in any way, shape, or form. But without that information, an expert would do them no good. He had the information, though. He had the Arizona study. And the results of the same comparisons in the Illinois database are no different because, as Justice McBride pointed out, this profile only matches to one person in the database at nine loci, and that is defendants. And that, again, was true before trial. It was true at trial. It remains true today. And if ten years from now somebody else is convicted of an offense and his profile is uploaded into the database and he matches it to those nine loci, it will hit. It will be continually searched. How do you then explain, and I read what you wrote on this subject, but how do you explain Parker's scathing denunciation of nine loci studies? I would say that he's wrong, and that that was addressed on cross-examination. It was pointed out, as Justice McBride said, that we haven't always used 13. We've used less than that earlier in the years of DNA, and that matches can occur. He never said that a nine loci profile wasn't good. In fact, I'm pretty sure he even admitted that his lab, Independence Forensics, did analyses and made conclusions based on less than 13 loci. So he was not a good witness for the defense in that case, and we addressed that on cross, and then Dr. Chakraborty testified and really knocked out the statistical portion of that. Have you made the points you came up here to make? I hope so. Then I would invite you to give your opponent a chance right now, and you'll have some rebuttal. Thank you very much. Good afternoon. May I please report to Scott Mayne again on behalf of Harvey Ray? You'll have to talk a little more into that microphone. Although, frankly, take that back. That microphone does not amplify. It simply records. You'll have to project a little more. Absolutely. That won't be an issue. From the opening statements in this trial, we've known all along that this case is about DNA. Charges were filed against Mr. Wright in 2004 based on a brochure profile that had been recovered from a victim of a sexual assault in 1998. Sort of where we started here today in our conversation is I think we basically set out that a DNA match when these numbers start to line up, that just means that the criminal suspect potentially could have contributed the DNA sample that's been found at the scene. And then it's what we do at that next step. We need to figure out a way through this identification process to assign a statistically created numerical value. Do you think that that's the burden of the circuit court to do it all by itself, or does it need the craft and initiative of the party through his attorney or otherwise to arrange for that? In other words, was there a sufficient agendum presented to the judge by way of motions to justify a characterization of his rulings as being either erroneous or a failure to correct an error? And if so, show us here. Well, I think it's seen in both motions filed by counsel. Counsel filed his first motion, again, to take a very short sidestep. One of the reasons all this litigation, all this pretrial work was being done, was by virtue of the limitation that had been put on defense counsel in trying to work out this case, based on the disruption of the co-filer, the sample for the co-filer based on the rectal swab. Well, those are the other four loci. Exactly. Once that had been denied, the court denied the motion to bar the evidence, said it went to its weight, not its existence. Then we actually need to get back into the motions themselves. Okay, but let's do that. So you have this denial of the motion to bar the rectal swab evidence. Now, and no doubt, the Arizona study had been out there. True? True. All right. And defense counsel had the Arizona study. Well, he was aware of it. He was aware of it. He had it by the time he filed a supplemental order. In fact, it was because of the Arizona study that he said he wanted the Illinois database to determine how many matching pairs or pairs matching were in the database. Correct. But he didn't specifically spell that out at the time of the motion to bar. Well, here's what he spelled out. Okay. He spelled out, this would give perspective to the strength of the partial profile match developed in this case. That's in his first motion. And in his second motion, he said the findings in Arizona are relevant in determining how much weight to attach the statistics set forth in Arizona. Well, did someone stop him from using the Arizona study? The court did. No, but at that time, the record clearly shows that he asked a question, the court said, objection sustained. The court said, we had motions in Illinois. I believe we had motions in Illinois. And I think that's actually, that's kind of a curious point there, too, because. Well, let me ask you this. Sorry, I keep talking. Isn't there supposed to be at that point the old offer of proof? We think that, I mean, my read of what he's talking about right then, when the court said we had motions in Illinois, it's a pluralized form, if my memory serves me correctly. Okay. And I think he, you know, perhaps was using an inartful term there, but my recollection, my understanding, was that he was reverting back to these two motions that were denied. Okay. These two motions had set forth everything that was needed to be able to explain why this evidence would be relevant. All right, but at that point, now, if I give you what you're saying, at that point, doesn't the lawyer have to explain to the judge or make an offer of proof for us here later to be able to see what it is that he wants to do with the Arizona study and the Illinois study? Doesn't he have to do that so we can see whether the court erred in the denial? His motions do that. When you look at his motions. All right. And because, again. All right. But is there anything that really shows us he erred because we don't have anything other than, you know, the Arizona study. We don't have anything to show us that denying cross-examination on the study at that point somehow would have cast doubts upon the testimony that had been presented. Are people routinely using the database studies to cast doubt on the random match probability testimony that's been given routinely in DNA cases? Well, routinely, I guess, might be a slight misnomer there simply because this is the result of Illinois came out a few months before Harvey Wright went to trial. I mean, there simply has not been many cases that have been able to be worked up that have focused in on this specific aspect. Well, then let me ask you this. Have there been any cases that you became aware of where the denial of cross-examination on a database study vis-a-vis DNA testimony regarding a profile and random match probability statistics has been shown to be error? No. Anywhere? What I have seen, the one time this came up was actually in a case cited by the state and I think their answer to, or their reply. All right. And what case would that be? A case out of Maine. Out of Maine. But what does it say? Basically, this is a case in which the defendant was attempting to get what is now being known as the Arizona type search in Maine to have that run in the Maine database. They did a pretrial motion on trying to get this search run. The search was the state called an expert from their sort of Illinois State Police, their version of that, and she offered a number of reasons as to why she felt doing that sort of cross-comparison analysis would not yield reliable results. And so ultimately the court affirmed the denial of request for an Arizona type study there in Maine. However, there was one critical passage in that decision in which the court said the defendant would not be limited in his cross-examination of the state's evidence in regards to the findings that he was aware of. So in that case, they, you know, there's... What is the name of that case? You said it's in their reply? State Beech Wire. All right. Now, so we have that case. What was that again? State Beech Wire. It's 985-8 seconds, 469. But that's the only case that you've been able to... I think the Davis case out of D.C., I believe, mentions the findings out of Arizona and the findings in Maryland, but this sort of leads us to sort of what, you know, a lot of our conversation has sort of shifted from the way it was originally presented in the brief. And one of the things, the area that is being developed in the courts right now, the real area that this is actually being talked about is in dealing with database cases. And the state and I disagree in terms of how exactly these two initial profiles came into an association, but I believe, again, from their answer in rehearing, they indicated that this was an association found in their forensic index. So basically these were... How do we establish, even if it is error, that it's not harmless error? At what point do you say that 1 in 700 could lead to a result of reasonable doubt by a jury? What about 1 in 7,000? What about 1 in 400? Where do you draw your benchmarks here? Particularly without an offer of proof, we don't even know any of that information. Well, Your Honor, we know what we would do with this information. You start with this information. Basically, everything that we have to... From the beginning of Illinois jurisprudence on DNA, you're dealing with how do you put forth these statistics to a jury in a way that they can understand. Wouldn't there be someone out there that the defense could have easily called to explain to the jury what you're saying was critical here, that the database studies somehow impeach the DNA testimony that has been used now, tried, and tested for quite some time regarding the random match probability? Well, I do want to talk about random match probabilities at some point. But first and foremost, I don't see how you could do that when your pre-trial motions were denied. You made a motion saying you wanted to deal with this relevant evidence out of Arizona and or additionally... The thrust of the argument at that hearing, and I think the record... Of course, the thrust of the argument, but the beginning of the argument... The very first thing said was we would like to proceed on the pleadings. And as this court's opinion made very clear, that that's all that's necessary in order to provide the notion that... And when the judge has said he's read the motions and... If it's just denied borrowing of the use of the rectal swab, but where were you denied the right to present an expert to show that this study or the Illinois study would have impeached this testimony? Is that what you wanted to do with it? We explained in our motion why this would be used to confront their statistics. The state objected in their response. They claimed this was nothing more than a fishing expedition. It would not amount to any relevant evidence. They were already keyed into the fact that the only question here is relevant. In fairness to the trial judge, did you ever... Really, not you, but the lawyer that tried this, did that lawyer ever really put to the judge what you're asking us to do now? In other words, did the lawyer say, well, all right, judge, you've denied our motion to file, but we want to present evidence regarding the Arizona study and we want the Illinois study and we want an expert to be able to explain why this testimony is impeachable or it's incredible or it's not believable or it's junk? It's not junk, but it certainly, I think, is set out in the motion. I don't think that once you've put in the motion why you want to do this and you say that you're proceeding on the motions, the court says it has read the motions, and when that motion is denied, there isn't anything... You're not then saying, but, but, but, we would like to, despite your denial of that motion, we still want to fly in the face of the ruling you've just made and call someone that we indicated would be the likely proponent of that evidence. All right. Furthermore, you never designated an expert, did you? We never designated an expert because these motions were being ruled on, I believe, about nine months before, actually, that was a made-up number, but they were being ruled on months before the actual trial. Had this, I mean, obviously, had this, had the Illinois State Police been ordered to run this cross-comparison analysis, which was run in Luna, that would have delayed, you know, they would have had to have gotten the results. The results would then have to be handed to our experts, the state experts. What do you say to the state's counter that when the match was first, when this sample was first identified, that in the Illinois database, the nine alleles didn't come up to any other possible donor than Mr. Wright? I would have to say I think this would be reading between lines of the record. I believe that that probably is a fair assessment. But there's no evidence of it directly. Well, I don't, again, you know, because of the manner of how this case proceeded, and obviously, I mean, you know, the bedrock point here is that because of the way that these motions were denied prior to trial, you know, and the thrust of the defense strategy altered, there was never then the need to fully cross-examine or attack sort of the manner in which these connections were made when the state's experts were on the stand. Could the record equally suggest that the defense consent that was argued but not, you know, presented by way of testimony was equally applied because of the DNA evidence in this case? Can you explain that? I'm sorry. Well, you're arguing that the consent defense was presented at the last minute because of the bar of the evidence. But couldn't it have been apparent that the reason the defense of consent was raised was because of the DNA evidence that was there facing the lawyer who had to try the case? We knew of all the DNA evidence at the time that they were filing the motions. If the concern was there ultimately was not going to be anything to fully be able to attack this science, that the decision about consent could have been made at that point. Well, you're saying that, but what about an expert? There was no suggestion that any expert would come in and in any way support this notion that the Arizona study or the Illinois study would in any way impeach the testimony that was presented by the state. We need findings first before you would ever call an expert. Incidentally, I have some difficulty accepting your argument that the consent defense does not constitute a judicial admission. It's one thing to say you're relegated to argue a different theory because you're circumscribed by the rulings of the trial judge in proceeding on your preferred or original theory. It's another to completely counter the facts and urge a factual defense that totally negates the need to establish the DNA evidence because the content is admitted. Thank you. I think this court's opinion firmly answered that question in recitation and citation to what I believe is the nylon decision. That there... Neely. There's an N on there. Neely? So in any event, I think that that answers the question. I have difficulty with that concept because it's one thing when you have an alternative to argue contract or argue fraud, and because of certain rulings you proceed to argue fraud, it's on the same base of facts. You're not totally changing facts. But to call the argument based on consent as being simply arguing in the alternative gives me considerable thoughts. But I think that, I mean, first and foremost, too... That's what the lawyer did do. He did argue in the alternative. Yeah, but he changed the facts. He can't have hypothetical consent. It's actual. And it is 180 degrees away from the defense of not being the right party. The defense counsel's best strategy was known to them from the get-go. There is no confession. There is no eyewitness. There is no physical evidence outside of the only evidence that the state was really going to go forward on in this case is going to be DNA. Well, let me ask you this. The state attorney said that you're not contesting the Arizona study or lack of being given the Illinois database study vis-a-vis the undergarments DNA. I'm contesting. I mean, basically, the reason why they were seeking to determine the number of 9 loci matches in Illinois was obviously hinged on the finding out of Arizona that when you actually start to look at these databases, this opens up questions in terms of the number of coincidental matches that could occur. Well, then why isn't this something that is being litigated strenuously in other cases across the United States? Wouldn't this be something that would be a very common area for cross-examination? And going into cross-examination, what is the error of a structural nature that you would tell us was present here to get past the core picture? We're not asking for it. This is not a structural error. I mean, second-pronged plain error is not a structural error. These are two distinct concepts. You're right. Let's take it from the traditional language. It's of the right that's so substantial that it challenges the integrity of the trial itself. Does the defendant have a substantial right to present a defense? Yes. Does the defendant have a substantial right to confront the scientific evidence that's being offered by the state? Yes. Was the pretrial ruling on attempting to be able to discuss the findings out of Arizona and or figure out how many coincidental matches we find in the Illinois database, would that lead to the- So any exclusion of evidence on cross-examination would be of that magnitude that it would pass the second prong, is that basically what you're saying? We know that Crawford violations have been found to be violative of the second-pronged plain error. Well, the Crawford violation has to do generally with the right of confrontation. Are you extending the, so to speak, I'm manufacturing Justice Douglas' term for you because I find no other. The penumbra of Crawford to encompass any exclusion of evidence on cross-examination to reach the magnitude of the second prong of plain error? No. Well, that's what you're doing, it seems to me. What I'm doing is I'm explaining to you that when you cut off the only real way to be able to adequately confront this evidence, then you've necessarily, I mean, this case has always been the focus of the strength of the DNA evidence. The notion that you can't confront and attack that, how could that not deny a fair trial? When your trial is based on what is the significance of this DNA evidence? So errors by the court on questions of relevance during cross-examination rise to the level of, reach the second prong of plain error, according to your notion. Once the error, once the limitation on this cross-examination. It's a pretty broad extension. Can I finish? Yeah. Once the limitation actually goes to the ultimate question, that is at issue in the case. I'm not talking about, you know, the inability to ask a question about his prior conviction. I'm talking about the ability to adequately confront the only evidence that's brought this man to court. The only evidence that now has this man serving a life sentence. I think we agree, I think we can agree that, you know, you're, what part of the, you know, concern here is the question about cross-examination. But when we get to that, don't we have to look at whether the court erred on that point in the record when you wanted to cross-examine on Arizona? Is that what we look at? What are we looking at? Do we look at whether the court said objection sustained? I think that what we're looking at is the, that's reflecting back to the rulings made prior to trial. We know what the rulings made prior to trial are. And I think that, I mean, admittedly, I think this is a situation in which there had been turnover of attorneys and, you know, the attorney who then was there to handle the forensic evidence was not a party to the rulings, to the motions that had to do with the, that had to do with the, you know, the initial rulings. This is a new attorney that may not have even been privy to the fact that the court had already said you can't even go into Arizona. Hence the question was asked and the court just said we've had motions eliminating on this and move on. I think it's important to make one other quick point, if I may. One of the areas that you were sort of focusing on was in terms of, you know, what's out there in terms of the research, what's out there in terms of what's happening in the courts. Things are happening in the courts right now by virtue of this And the development of further relevant evidence is being made available. It was made available in the Long-Limit Trial. It was used in the Long-Limit Trial. But moreover than that, there are studies that are going on and there are studies that the state cites and there are studies that we cite that they say these coincidental matches are to be expected. We have studies that are saying our numbers actually aren't being able to fully explain why, you know, we're getting nine coincidental matches. Let me ask you then, how would you reconcile the statistical processes, the mathematics, that leads to one in 540 billion through one approach and one in 700 to another? Let's assume that they're both valid. There's got to be something in one of those studies that would be of a significant deprecation of its evidentiary value. Well, however it's being deprecated is clearly then answering to its weight. Well, I think, excuse me, there's a lot of weight to answer for. It's one thing to answer for one zero or two zeros, but the answer for eight zeros is very significant. And what we're dealing with, I mean, all we're dealing with is they've, we have these numbers that have been assigned but based on each of these alleles and then they multiply out and so you arrive at a place in which you have astronomical numbers. And then when you actually take a look at these databases, once you actually are inside the database, you're now finding pairs of people that are matching at many more loci than those numbers would ever, ever hope to explain. In Maryland, they had three that actually matched to 13. In Arizona, there was 20 pairs of 10. But in those, in each of these studies, there is absolutely no room for relatives, right? What they've attempted to do, I mean, this is one of the studies Dr. Lawrence Mueller has attempted to explain, how do we get to that 20? And because every, basically the commonly used models were not ever arriving at a conclusion that explained the 20. And he was finding that you would have to elevate the number of pairs to an amount that is sort of going against common sense in order to find it, to get it to a place where you're finding enough that would match at least 10. We, this is in its infancy. I mean, I've been playing with this case now for two years. We're not to the point where there's a lot of material to work with. This case began, its very first line was that this was a case of first impression. And what that means is, I mean, we're starting a conversation, and that's why I was happy to come back to continue this conversation today. These are things that are in the process of working their way through the court systems. This is happening here in Chicago. This is happening in California. Further development and further efforts are being made at all times to try to better explain these numbers. As it currently stands, the defense is basically attempting to use these coincidental matches is a beginning of the defense. From there, there would have been ways in which we then could have developed cross-examination because, you know, the point that I'm sure I'm out of time to deal with, but when dealing with, when you're getting these astronomical numbers, those numbers are seeking to explain two different ideas. One of which is the rarity of the profile, and the other is the random match probability. And that's where I did want to take, to at least make it known. In my briefs all along, I've never challenged the fact that these product rule numbers are still an accurate statement of rarity. What I am challenging is that we don't actually know if these are still, excuse me, a true representation of the randomness, the random match probability. And using the findings in Illinois, using the findings in Arizona, that is the beginning. Because what we're dealing with is trying to explain this information to a jury. And, you know, as any of us would know, once you throw one of these, you know, 14-0 words out in front of a jury, we're done. It's a 94-95% rate that they're now convinced. But, if we begin by stating, hang on, one of the things they're attempting to do is explain how random this could occur. Look what happens when we actually look in a database. We actually find random occurrences that we would not expect. And then they could call their expert that said, of course we would expect that. But doesn't that still amount to an ability to put forth a defense? An ability to actually confront these numbers, which are the only things that are putting a man in jail for the rest of his life. Counsel, we have not interrupted you because we wanted to make sure you get an opportunity to complete your presentation. If there's nothing else, we're going to call for rebuttal. Thank you. Unquestionably, the defendant has a substantial right to present a defense and to cross-examine. I hope two minutes won't be too much. I don't think so. Has a substantial right to present a defense and to confront the state's evidence. He does not, however, have a substantial right to cross-examine with irrelevant information. If that were true, then the trial courts would not be given the power that they're given to limit cross-examination. It would be an unfettered right to cross-examination. The U.S. Supreme Court has made clear that DNA evidence is subject to the same rules of law as other evidence. And a basic rule of law, of evidence law, is that relevant evidence is admissible and irrelevant evidence is inadmissible. The results of a search are irrelevant. Now, as far as the confrontation goes, I'd like to make clear, and I think this is somewhat clear, the defendant was not in any way prevented from developing an argument related to the databases or searches or presenting one. If this court looked at what he asked for in his original pre-trial motion, he asked to exclude the evidence and he asked for a court order for a database search. Because he would need a court order to order the Illinois State Police to do such a search. And that is what the trial court denied. He never asked the trial court to rule on the admissibility of database searches. And the trial court never ruled that such facts would be inadmissible. And then we have the colloquy prior to trial where the defense counsel says, I'm not going to use it. And then you have the court's ruling on the objection during cross-examination, where, as Justice McBride pointed out, the same thing happened. Objection sustained and the defendant abandoned the line of questioning. The court didn't affirmatively block him or prevent him from giving an offer of proof if at that point he had a change in strategy and decided he wanted to revisit the idea of maybe trying to use the database. Are you still maintaining your 165 argument that it doesn't enumerate that particular kind of search and therefore is unavailable? That is the state's position. That, however, would be a secondary argument, just basically since it came up in the opinion to address that. Really the primary issue is whether this was developed below in forfeiture and the relevance. But we do stand by our position on that. I would also like to point out that the statistics regarding the rarity of the profile on the underwear are, for lack of a better word, higher than the statistics for the rarity of the profile on the retro slot. So if there's any confusion regarding the quality of the state's evidence, I mean, the profile identified from the workup done on the underwear is rarer than the one on the retro slot. And while he now is saying that he's challenging the statistics with that, that's really not something that's ever been addressed. His final comments regarding the numbers, that's a reference to database match probability, which is a completely separate beast than even the database searches at issue here and really is a red herring. Database match probability asks the question, what's the likelihood of finding a particular profile in a database? It's like, you know, it has nothing to do, that would never be relevant in a criminal case. In a criminal case, the issue is, you know, what's the likelihood that this defendant contributed to the family? I don't understand statistically the difference between a database and a population. It all depends on the legitimacy of the sampling, which is not really a question of where it's found, but how it's selected and the number that has been selected. So what's the difference between the population that you find in a database and the general population that is used basically in the product study? And that still eludes me. I'm sure there is a difference, but it looks like I'm going to have to dope it out for myself if I can. If this exhibit, A17, in the underwear sample, there are several alleles where it's either this or that. Yes. Some inconclusive. Yes. There are cases where those things aren't missing. True? Where there's a full profile? Yes. I'd call it a clean profile maybe would be a good way to say it. Sure. There's cases. When we test an unknown offender, a buckle swab, that's the only DNA that... What do those... What do they mean? Yes. In this case, this isn't a complete profile that was able to be gleaned from the underwear. Isn't that true? Is it a complete profile? It's not a complete 13 locus profile. I think that would be a pretty accurate way to state it. What it is is it was a mixture. Whenever you have a mixture, that means more than one contributor. In this case, the victim and another person. Is that what he was saying? The ones that were inconclusive or it was either this or that, those were the samples of the donors. He was giving her first... He said something about we have the one first. We assume that the female donor profile is... Is present in her own underwear. Yes. What they do is they test the sample and they get a chart... Not a chart, excuse me. It's like a graph, an electro-paragraph with a lot of peaks on it. And that shows the presence of different alleles at different locations in differing amounts. And from that, they then have a known blood... I think it was a blood standard from the victim in this case where they've generated a profile. So we know what the victim's 13 loci profile is. So then the analyst takes that known and as an expert, subtracts out the victim. And this is all included in the results. It says assuming that the victim was a contributor. So basically, subtracts out the victim's alleles. And that's how you end up with... At a few locations, you might have a couple of different possibilities for who that other donor is, that male donor. So as Edgar Hove explained, they take the conservative route and report both because that's the correct way to do it. Because there are, I think, one or two different loci. There were two possible profiles of the contributor. So they report out both. And the statistics, because again, this really all comes down to the statistics, take that into consideration. All right. So it's done in the most... The statistics are done in the most conservative manner. And by conservative, I mean to the benefit of defendants. So less rare numbers. So I don't know if that answers your question. You subtract out the known. You generate a... It's called a deduced profile of the other donor. And in this case, there were a few locations where there were a few possibilities for that deduced profile. And that deduced profile is reported. And defendant cannot be excluded as the contributor, as being the contributor to that deduced profile. And the statistics of that were 1 in 5.4 quadrillion black, 1 in 4.3 quadrillion white, and 1 in 66 quadrillion Hispanics cannot be excluded as being the male contributor of that profile on the underwear. Is there anything else now? I don't think so. I thank this court for the opportunity to be here. Okay, I want to commend both sides for the superb briefs that they submitted, both originally and in the rehearing petition and in the superiority of their oral presentation. You've given us a lot to rethink, which we will. And hopefully we'll be back with our results without waiting until this gentleman is free.